UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ANDREAS HARRIS, ALEXANDER COLE, STEPHANIE EYTCHESON, and ANNA LAIRD, <br><br> Plaintiffs, <br><br> v. <br><br> U.S. ENVIRONMENTAL PROTECTION AGENCY and LEE ZELDIN, in his official capacity as Administrator of the U.S. Environmental Protection Agency, <br><br> Defendants. | Case No. 26-cv-7640 |

**COMPLAINT**

1.      Federal government employees, like all citizens, have the right to participate in public discussion and debate in their personal capacities, even when their speech is critical of the government. In June 2025, Plaintiffs exercised that right. Along with hundreds of other current and former employees of the U.S. Environmental Protection Agency ("EPA" or the "Agency"), Plaintiffs signed a letter to the EPA Administrator and Congress that opposed the Trump-Vance administration's policies.

2.      Agency officials recognized that the letter was protected speech. The director of EPA's Ethics Office wrote to colleagues that "employees are simply exercising their first amendment rights to express their opinions."[1] She added that "[t]he petition states on its face that the employees are acting in their personal capacity and on their own time."[2] Another EPA

---

[1] Kevin Bogardus, *Zeldin Disciplined EPA Dissenters After Ethics Office Found No 'Concern'*, E&E News (Mar. 11, 2026), https://perma.cc/L5AE-G5XJ.
[2] *Id.*

1

attorney advised that "the agency should not take personnel actions against the employees who signed the letter" because "the letter is likely protected speech under the First Amendment."[3]

3. Those assessments were correct. By signing the letter, Plaintiffs simply expressed their opinions as private citizens on the matters of public concern raised in the letter, such as the politicization of EPA, the erosion of science-based decisionmaking, and attacks on the career civil service. Plaintiffs signed the letter outside the workplace, on their own time, and without using agency resources. In short, Plaintiffs engaged in free speech protected by the First Amendment.

4. Nevertheless, EPA fired them. Disregarding the advice of their own senior officials, EPA leadership retaliated against Plaintiffs for exercising their constitutional rights.

5. Plaintiffs bring this suit to protect their First Amendment rights and seek reinstatement to their jobs at EPA, along with other remedies.

6. Plaintiffs bring the issue to this Court because, as probationary employees, they have no right to appeal their terminations to the Merit Systems Protection Board. Plaintiffs attempted to seek relief by filing administrative complaints in the Office of Special Counsel (the "OSC" or the "Office") to challenge EPA's prohibited personnel practices, but that Office has not redressed EPA's unconstitutional conduct. After nearly seven months, Plaintiffs have received no indication of any specific steps the OSC has taken to investigate their complaints or when it expects to complete its investigation. And even if the OSC found that EPA violated Plaintiffs' constitutional rights, they would not be guaranteed a remedy or a path to judicial review.

---

[3] Kevin Bogardus, *Trump EPA punished dissenters despite 'legal risk' warning*, E&E News (Apr. 2, 2026), https://perma.cc/DFR4-MS94.

7. All the while, Plaintiffs continue to be deprived of their First Amendment rights.

## JURISDICTION AND VENUE

8. This Court has jurisdiction under 28 U.S.C. § 1331 because this action arises under federal law.

9. The Court has authority to enter a declaratory judgment and to provide injunctive relief under Rules 57 and 65 of the Federal Rules of Civil Procedure; the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202; the All Writs Act, 28 U.S.C. § 1651; and the Court's inherent equitable powers.

10. Venue is proper in this district because Plaintiff Andreas Harris resides in the Northern District of Illinois and a substantial part of the events giving rise to the claim occurred in the Northern District of Illinois. 28 U.S.C. § 1391(e)(1).

## PARTIES

11. Plaintiff Andreas Harris is a former EPA employee.

12. Plaintiff Stephanie Eytcheson is a former EPA employee.

13. Plaintiff Alexander Cole is a former EPA employee.

14. Plaintiff Anna Laird is a former EPA employee.

15. Defendant U.S. Environmental Protection Agency is a federal agency. Its headquarters are in Washington, D.C.

16. Defendant Lee Zeldin is the Administrator of EPA. This suit is brought against him in his official capacity.

## STATEMENT OF FACTS

**I.      Plaintiffs' Employment as EPA Probationary Employees**

17. Plaintiffs began working at EPA in 2024. Because they were new to the Agency, they were considered "probationary" employees, as explained further below.

3

18.     **Andreas Harris** was a physical scientist in EPA Region 5's Office of the Regional Administrator, Water Division, Ground Water and Drinking Water Branch. EPA Region 5 serves Illinois, Indiana, Michigan, Minnesota, Ohio, Wisconsin and 37 Tribal Nations. Harris worked in EPA's Region 5 office in Chicago.

19.     Harris holds a bachelor's degree in environmental science. Prior to joining EPA, Harris was an environmental researcher, a soil scientist, and a restoration ecologist.

20.     Harris started his employment at EPA on November 18, 2024.

21.     As the Illinois State Program Manager for drinking water, Harris coordinated with his state-level partners to provide program oversight, project management, and performance evaluations to ensure compliance with the Safe Drinking Water Act and other applicable laws. Harris analyzed state-submitted drinking water data and operational procedures against federal requirements to assess program effectiveness, monitor corrective actions, and track program performance metrics to strengthen program efficiency and compliance.

22.     **Alexander Cole** was a biologist in EPA's Office of Research & Development, Translational Toxicology Branch, Great Lakes Toxicology and Ecology Division (GLTED). Cole worked at the GLTED Lab in Duluth, Minnesota.

23.     Cole holds a bachelor's degree in biology and a doctorate in environmental science. He worked as a researcher alongside his studies and joined EPA within months of graduating from his PhD program.

24.     Cole started his employment at EPA on June 30, 2024.

25.     As a biologist at the GLTED Lab, Cole worked on the expansion and development of EPA's ECOTOXicology Knowledgebase. He collaborated directly with program offices, such as the Office of Water, Office of Chemical Safety and Pollution Prevention, and

Office of Land and Emergency Management, to collect the ecotoxicity data necessary to complete thorough risk assessments for chemicals of concern. He also focused on developing tools to assist in the risk assessment process for chemicals without existing ecotoxicity data.

26. **Stephanie Eytcheson** was a biologist in EPA's Office of Research and Development, Center for Computational Chemistry and Exposure, Great Lakes Toxicology and Ecology Division, Translational Toxicology branch. Eytcheson worked at the GLTED Lab in Duluth, Minnesota. In May 2025, Eytcheson interviewed for a lateral transfer to EPA's Office of Chemical Safety and Pollution Prevention, Office of Pesticide Programs, Antimicrobials Division after learning that EPA might shut down the Office of Research and Development. Eytcheson was selected for a transfer, and she was transferred to the Office of Chemical Safety and Pollution Prevention while she was placed on administrative leave following her signature of the letter to EPA.

27. Eytcheson holds a bachelor's degree in chemistry and a doctorate in environmental toxicology. Prior to joining EPA as a full-time hire, Eytcheson was a postdoctoral researcher at the GLTED Lab for three years.

28. Eytcheson started her employment at EPA on December 1, 2024.

29. As a principal investigator biologist at the GLTED Lab, Eytcheson conducted research that aimed to develop tools to more rapidly identify whether chemicals are safe or not, which would enable safe chemicals to be registered and brought to market faster.

30. **Anna Laird** was an Attorney-Adviser in EPA Region 10's Office of the Regional Administrator, Office of Regional Counsel, Land Law Branch. Region 10 serves Alaska, Idaho, Oregon, Washington, and 271 Tribal Nations. Laird worked in EPA Region 10's office in Seattle.

31. Laird holds a bachelor's degree in general engineering and a juris doctorate with a certificate in environmental and natural resources law. Prior to joining EPA, Laird practiced law at private firms in Chicago, Illinois and Portland, Oregon.

32. Laird started her employment at EPA on March 24, 2024.

33. As an Attorney-Adviser, Laird was responsible for performing legal research, writing, and analysis and providing legal advice and recommendations on cleanup and cost recovery matters under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), among other duties.

II. **Stand Up for Science's "Declaration of Dissent"**

34. In June 2025, Plaintiffs, along with hundreds of others, signed an open letter titled "Declaration of Dissent."[4] The letter was addressed to EPA Administrator Zeldin. Copied on the letter were the U.S. Senate Committee on Environment & Public Works, the U.S. House Committee on Energy and Commerce, the U.S. House Committee on Science, Space, and Technology, and members of Congress.

35. The letter was hosted by an organization called Stand Up for Science. Stand Up for Science describes itself as "a political activism organization dedicated to defending and advancing America's scientific ecosystem, a cornerstone of democracy, freedom, and progress."[5] According to Stand Up for Science, the organization was founded in February 2025 "in response to the Trump Administration's dismantling of our nation's premier science institutions and escalating threats to the lives and livelihoods of Americans."[6] Stand Up for Science organizes

---

[4] Stand Up for Science, Declaration of Dissent (June 30, 2025), https://perma.cc/8ZQ3-J89L (attached as Ex. A).
[5] Stand Up for Science, About Us (last visited June 26, 2026), https://perma.cc/U62T-B229.
[6] *Id.*

6

rallies around the country and also engages in messaging campaigns and grassroots organizing to support its cause.[7]

36.     Stand Up for Science has organized a series of open letters to federal government officials that are available for signature.[8] Among those other open letters are the "Katrina Declaration" addressed to members of the Federal Emergency Management Agency Review Council to oppose "the effective dissolution of FEMA";[9] the "Bethesda Declaration" addressed to the Director of the National Institutes of Health in response to "Administration policies that undermine the NIH mission";[10] and the "Voyager Declaration" addressed to the National Aeronautics and Space Administration interim administrator about the Trump-Vance administration's cuts to NASA programs.[11]

37.     The EPA "Declaration of Dissent," Ex. A,[12] begins: "EPA employees join in solidarity with employees across the federal government in opposing this administration's policies, including those that undermine the EPA mission of protecting human health and the environment. . . . [W]e stand together in dissent against the current administration's focus on harmful deregulation, mischaracterization of previous EPA actions, and disregard for scientific expertise."

38.     The letter proceeded to identify five specific ways in which Secretary Zeldin was "recklessly undermining the EPA mission"— "[u]ndermining public trust," "[i]gnoring scientific

---

[7] *Id.*

[8] Stand Up for Science, Petitions (last visited June 26, 2026), https://perma.cc/8AV2-AXSB.

[9] Stand Up for Science, FEMA Katrina Declaration (Aug. 25, 2025), https://perma.cc/A8Y8-J4M9.

[10] Stand Up for Science, Bethesda Declaration (June 9, 2025), https://perma.cc/3F2E-VMY3.

[11] Stand Up for Science, NASA Voyager Declaration (July 21, 2025), https://perma.cc/U3FC-ZRNT.

[12] *See supra* n.4 (Ex. A).

7

consensus to benefit polluters," "[r]eversing EPA's progress in America's most vulnerable communities," "[d]ismantling the Office of Research and Development," and "[p]romoting a culture of fear, forcing staff to choose between their livelihood and well-being."

39. The letter argued that, as a whole, the Agency's actions "will not protect communities from hazardous chemicals and unsafe drinking water, but instead will increase risks to public health and safety."

40. The letter concluded by calling on Secretary Zeldin to "correct course."

41. The letter addressed matters of public concern such as the government's failure to protect public health.

42. The letter expressly stated that it was being signed in employees' personal capacities. It stated: "This declaration was written and signed by EPA employees across Offices, Regions, and Labs in our personal capacity, on our own time, and without Agency resources. . . . We sign this declaration both as concerned citizens and dedicated civil servants."

### III. Plaintiffs' Signature of the "Declaration of Dissent"

43. Each Plaintiff signed the "Declaration of Dissent" in their personal capacity.

44. Each Plaintiff signed the "Declaration of Dissent" on personal time outside of work hours. They signed the letter at physical locations that did not belong to EPA. They signed the letter on personal electronic devices that did not belong to EPA.

45. **Andreas Harris** signed the letter outside of work hours on Wednesday, June 25, 2025, on his personal cell phone from his home.

46. **Alexander Cole** signed the letter outside of work hours on Sunday, June 29, 2025, from his personal cell phone from his home.

47. **Stephanie Eytcheson** signed the letter outside of work hours on Sunday, June 29, 2025, on her personal cell phone from her home.

8

48.  **Anna Laird** signed the letter on her personal cell phone, in her own home, outside of work hours.

49.  On June 30, 2025, Stand Up for Science publicly announced that it had sent the Declaration of Dissent to the EPA Administrator.[13]

50.  Soon after that, the names of Cole, Eytcheson, Harris, and Laird were publicly available on the Stand Up for Science website alongside the names of other signatories. As of June 30, 2025, the website showed that there were 324 total signatories.[14] Among those signatories were "Andreas Harris, Region 5"; "Alexander Cole, Ph.D., Office of Research and Development, WI, Great Lakes Toxicology and Ecology Division"; "Stephanie Eytcheson"; and "Anna Laird, ORC, Region 10."[15]

51.  Each Plaintiff understood that, to the extent they included information about their job title or region to their signatures, it was for identification purposes, not to suggest that they signed on behalf of EPA or represented an official agency position. No reasonable person would have understood the signatures to reflect their employer's position because the Declaration of Dissent was expressly addressed to the EPA Administrator to express disagreement with the agency's policies. Moreover, the letter expressly stated that the letter was being signed "in our personal capacity, on our own time, and without Agency resources."

---

[13] Stand Up for Science (@standupforscience), Instagram, https://perma.cc/Y7SC-BBDX (June 30, 2025) ("BREAKING: EPA workers just dropped their Declaration of Dissent."); Mazine Joselow, *E.P.A. Workers Warn Trump Is Politicizing Their Work*, N.Y. Times (July 3, 2025), https://perma.cc/2B95-D3BB.
[14] Internet Archive Wayback Machine, June 30, 2025 screen capture, https://perma.cc/7EVV-K4AS.
[15] *Id.*

## IV.    EPA's Investigation of Plaintiffs' Employment

52.    Documents released by EPA under FOIA show that on July 1 and 2, 2025, the Director of EPA's Ethics Office wrote in internal emails that, upon reviewing the letter, she and her staff had concluded that "there is no ethics concern" and that "the employees [who signed the Declaration of Dissent] are simply exercising their first amendment rights to express their opinions and . . . are not intentionally misusing their federal positions to bolster their opinions." Ex. B.[16]

53.    Documents released by EPA under FOIA show that on July 2, 2025, an Assistant General Counsel in the Office of General Counsel wrote in an internal email that "there are no ethics concerns with employees signing the 'stand up for science' letter" and that "the letter is likely protected speech under the First Amendment." Ex. C.[17] He advised that "the agency should not take personnel actions against employees who signed the letter."

54.    The same attorney reiterated his advice in an email on August 28, 2025, stating, "I do not expect any charge [of misconduct] will withstand judicial scrutiny." Ex. D. He further noted that terminated probationary employees "may. . . have a cause of action in federal court that their termination constituted illegal retaliation for their first amendment protected speech."

55.    EPA leadership ignored these assessments by their career ethics officials and career lawyers.

56.    On July 3, EPA placed 144 employees on administrative leave and opened an investigation into their decision to sign the Declaration of Dissent.[18]

---

[16] *See supra* n.1.
[17] *See supra* n.3.
[18] Maxine Joselow, *E.P.A. Suspends 144 Employees After They Signed a Letter Criticizing Trump*, N.Y. Times (July 3, 2025), https://perma.cc/C2CS-CK8Y.

57. The investigation involved searching the signatories' work computers and email accounts, as well as directing employees to answer a survey about their use of federal resources to view and sign the letter.[19]

58. At some point during this period, Stand Up for Science removed the list of signatories from its website.[20] But EPA officials used an internet archive tool to see the version of the Stand Up for Science webpage that includes the list of names.[21]

59. **Andreas Harris** was placed on administrative leave on July 3, 2025. He was notified that he was being placed on administrative leave through July 17, 2025 "pending an administrative investigation." He received the administrative leave notification from Anne Vogel, Regional Administrator of EPA Region 5.

60. On July 16, 2025, Harris received an email stating that "EPA is conducting an investigation regarding the declaration posted [on the Stand Up for Science website]." The email included a link to a survey with questions about his signing of the Declaration of Dissent.

61. Harris received subsequent notices that his administrative leave was being extended. A July 16, 2025 notice stated that his administrative leave was being extended through August 1, 2025 "pending the Agency's inquiry into your signature on a public declaration." Subsequent notices included similar language.

62. **Alexander Cole** was placed on administrative leave on July 3, 2025. He was notified that he was being placed on administrative leave through July 17, 2025 "pending an administrative investigation."

---

[19] *See* Kevin Bogardus, *Inside EPA's Hunt for Employees Who Signed the Dissent Letter*, E&E News (Oct. 30, 2025), https://perma.cc/7EPK-4726.
[20] *Id.*
[21] *Id.*

63. On July 16, 2025, Cole received an email stating that "EPA is conducting an investigation regarding the declaration posted [on the Stand Up for Science website]." The email included a link to a survey with questions about his signing of the Declaration of Dissent.

64. Cole received subsequent notices that his administrative leave was being extended. A July 16, 2025 notice stated that his administrative leave was being extended through August 1, 2025 "pending the Agency's inquiry into your signature on a public declaration." Subsequent notices included similar language.

65. **Stephanie Eytcheson** was placed on administrative leave on July 3, 2025. She was notified that she was being placed on administrative leave through July 17, 2025 "pending an administrative investigation."

66. On July 16, 2025, Eytcheson received an email stating that "EPA is conducting an investigation regarding the declaration posted [on the Stand Up for Science website]." The email included a link to a survey with questions about her signing of the Declaration of Dissent.

67. Eytcheson received subsequent notices that her administrative leave was being extended. A July 16, 2025 notice stated that her administrative leave was being extended through August 1, 2025 "pending the Agency's inquiry into your signature on a public declaration." Subsequent notices included similar language.

68. **Anna Laird** was placed on administrative leave on July 3, 2025. She was notified that she was being placed on administrative leave through July 17, 2025 "pending an administrative investigation."

69. On July 16, 2025, Laird received an email stating that "EPA is conducting an investigation regarding the declaration posted [on the Stand Up for Science website]." The email included a link to a survey with questions about her signing of the Declaration of Dissent.

70.     Laird received subsequent notices that her administrative leave was being extended. A July 16, 2025 notice stated that her administrative leave was being extended through August 1, 2025 "pending the Agency's inquiry into your signature on a public declaration." Subsequent notices included similar language.

71.     EPA officials created a spreadsheet to summarize their investigation, which was later produced in litigation at the Merit Systems Protection Board initiated by employees other than Plaintiffs here. The spreadsheet listed each employee who had signed the letter and set forth EPA's conclusions on various points, including (1) whether the employee had signed the letter using their work laptop, and (2) whether the employee's signature on the Declaration would interfere with their job.

72.     According to the spreadsheet, EPA concluded that no Plaintiff here signed the letter on a work laptop.

73.     According to the spreadsheet, EPA also concluded that the signatures did not cause interference with Plaintiffs' jobs.

## V.     EPA's Termination of Plaintiffs' Employment

74.     After EPA's investigation into their signing of the Declaration, each Plaintiff was terminated from their job.

75.     **Andreas Harris** was terminated on August 29, 2025. The notice of termination, signed by Tiffani Kavalec, Chief of Staff, stated that "I have determined that your continued employment is not in the public interest." The notice contained no explanation of how or why Kavalec determined that Harris's employment was "not in the public interest." The notice was signed by Tiffani Kavalec, Chief of Staff of EPA Region 5's Office of the Regional Administrator, and the notice was on letterhead that said "Region 5 Chicago, IL 60604."

13

76. The Agency terminated Harris even though it concluded in its internal investigation that his signature on the letter did not interfere with his job.

77. **Alexander Cole** was terminated on August 29, 2025. The notice of termination, signed by Travis Voyles, Associate Deputy Administrator, stated that "I have determined that your continued employment is not in the public interest." The notice contained no explanation of how or why Voyles determined that Cole's employment was "not in the public interest." Cole received the notice of termination near the end of the day on the Friday before Labor Day, when EPA had already allowed a two-hour early release, so he had no ability to contact anyone about the termination before his access to EPA's network resources was revoked.

78. Cole requested a copy of the materials relied upon to support the notice of termination. He received a response from an EPA email address stating that "for a probationary termination, there is no materials relied upon file."

79. The Agency terminated Cole even though it concluded in its internal investigation that his signature on the letter did not interfere with his job. The spreadsheet summarizing EPA's investigation notes, "To the best of our knowledge, to date, the employee can carry out their job functions effectively."

80. **Stephanie Eytcheson** was terminated on August 29, 2025. The notice of termination, signed by Lynn Dekleva, Deputy Assistant Administrator for New Chemicals, stated that "I have determined that your continued employment is not in the public interest." The notice contained no explanation of how or why Dekleva determined that Eytcheson's employment was "not in the public interest."

81. The Agency terminated Eytcheson even though it concluded in its internal investigation that her signature on the letter did not interfere with her job. The spreadsheet

14

summarizing EPA's investigation notes, "To the best of our knowledge, to date, the employee can carry out their job functions effectively."

82. **Anna Laird** was terminated on August 29, 2025. The notice of termination, signed by Christina Carpenter, Chief of Staff, stated that "I have determined that your continued employment is not in the public interest." The notice contained no explanation of how or why Carpenter determined that Laird's employment was "not in the public interest."

83. The Agency terminated Laird even though it concluded in its internal investigation that her signature on the letter did not interfere with her job. The spreadsheet summarizing EPA's investigation notes, "Signing does not reduce the employee's effectiveness in an attorney role or my trust in the employee."

84. Aside from their signatures on the letter, there was no basis for any of the Plaintiffs to be terminated. None of their termination notices stated a reason for termination, aside from the vague and unexplained reference to the "public interest."

85. And although several hundred probationary employees at EPA were terminated in February 2025, Plaintiffs and the other probationary employees who signed the Declaration were terminated at least six months later, in August and September 2025.[22]

86. The timeline leading up to their terminations, including placement on administrative leave following their signing of the Declaration and the agency's investigation into their signing of the Declaration, makes it clear that their signatures were the reason for their termination.

---

[22] Kevin Bogardus, *'Complete roller coaster': EPA probationary staff returns to work*, E&E News (Dec. 9, 2025), https://perma.cc/L7TN-5FPG.

87. There was no performance-based reason for any of the Plaintiffs to be terminated. On the contrary, each Plaintiff had been recognized by EPA as an excellent performer.

88. **Andreas Harris** received two 'Shooting Star Awards' from his direct colleagues on February 6, 2025, as recognition for going "above and beyond the call of duty." One colleague stated that "[Harris] hit the ground running as the Illinois State Program Manager and is currently working to write the Annual End of Year Evaluation Report. The IL EOY report is complex since it requires working with two agencies: IEPA and IDPH." The other colleague noted Harris's "[e]xcellent performance in collaborating with the state on highly complex solution to fundamental challenges in its Corrective Action Plan." Harris's supervisor also acknowledged Harris's awards in an email on February 7, 2025, stating, "You are executing your role effectively and I encourage [you] to keep leaning and developing. Keep up the good work supporting the agency's mission."

89. **Alexander Cole**'s April 2025 progress review stated that "Alex has had an extremely productive first half of FY25," "has established [himself] as an extremely skilled and valuable member of the team," "has made several important contributions," and "is actively publishing, with several manuscripts accepted or in review."

90. Cole also received a performance award while he was on administrative leave because of his signature of the Declaration. The performance award justification stated that "[t]his award recognizes the exceptional work of Dr. Alex Cole in advancing, improving, and expanding the capabilities of the ECOTOX knowledge base, and in developing methods to extract and integrate ECOTOX data into analysis tools used by program offices for chemical assessments. . . . The combination of productivity and focus on Agency programmatic needs is richly deserving of recognition."

91. **Stephanie Eytcheson** received an email from her acting branch chief on February 13, 2025 stating that she had added notes to EPA's performance management system that "creates a record of how well you've done so far and how essential to our team you've become in such a short time." The notes stated that "[o]ur branch is extremely lucky to have Stephanie; she shows every indication of becoming an exemplary PI in our division."

92. On July 31, 2025, while Eytcheson was placed on administrative leave following her signature of the Declaration, the branch chief of the Antimicrobials Division, Risk Assessment Branch—where Eytcheson had been transferred—sent her an email to say that "we are happy to have you as part of the AD RAB team and are looking forward to you being able to join us soon."

93. **Anna Laird**'s annual review for FY24 stated that "Anna's performance . . . is deserving of a distinguished rating," that she "has quickly shown that she can handle a very heavy caseload as a new EPA CERCLA attorney," and that "she is nimble in moving to a different direction based on client or management feedback." Her review also noted her "excellent working relationships" and reputation among her colleagues, clients, and partners, emphasizing that "her SEMD clients and [] DOJ . . . report that she is a pleasure to work with and is extremely knowledgeable and helpful," and that she "serves as a mentor to newly-hired ORC attorneys with less CERCLA experience, and is always willing to help out others in ORC with any CERCLA or RCRA issues." Laird also received a performance-based cash award in the Summer of 2025, immediately before she was terminated.

94. Moreover, the Agency's decision to select Plaintiffs for termination was not based on any assessment of potential disruption or interference with their jobs. Rather, probationary employees were terminated without regard to any such assessment. EPA targeted them knowing

that they lacked the right to appeal their terminations to the Merit Systems Protection Board and thereby a path to judicial review.

95. On the other hand, the majority of signatories—who had stronger employment protections—either received a 14-day suspension or a letter of reprimand. Indeed, more than thirty employees were assigned no discipline at all because they were union representatives, again without regard to any assessment of potential disruption or interference.

96. When it terminated Plaintiffs, the Agency had no evidence that the dissent letter had any impact whatsoever on EPA's reputation, operations, mission, efficiency of service, or the authority of Agency leadership.

97. Before terminating Plaintiffs and other signatories, EPA had never before disciplined any employee for expressing their views on government policy or signing an open letter.

98. On the contrary, EPA's policies specifically protected employees' right to speak publicly when not acting as representatives of the Agency. According to the Agency's 2025 Scientific Integrity Policy: "It is the policy of the EPA to . . . [a]llow employees to express personal views by not limiting their right to communicate with the media or the public in their personal capacities."

## VI. Attempts to Seek Relief Through the Office of Special Counsel

99. At the time of their terminations, each Plaintiff was within the first or second year of their employment with EPA. Generally, federal employees within the first one or two years of employment (depending on the nature of the employee's appointment) are known as "probationary" employees. Each Plaintiff was classified by the Agency as a probationary employee at the time of their termination.

100. Probationary employees have no right to challenge their termination at the Merit Systems Protection Board and thus have no right to obtain judicial review of their termination through an appeal from the Board to the U.S. Court of Appeals for the Federal Circuit.

101. For most non-probationary employees, the Civil Service Reform Act allows for administrative review of terminations. Removal from employment is an "adverse action" that is subject to the protections of 5 U.S.C. chapter 75, subchapter II. 5 U.S.C. § 7512(1). An agency may remove an employee "only for such cause as will promote the efficiency of the service." 5 U.S.C. § 7513(a). A terminated employee is "entitled to appeal to the Merit Systems Protection Board," *id.* § 7513(d) (citing *id.* § 7701), and to seek review of an adverse Board decision from the Federal Circuit, *id.* § 7703.

102. Probationary employees do not have access to that administrative process. The definition of "employee" in chapter 75, subchapter II excludes various categories of federal employees, including probationary employees. *See* 5 U.S.C. § 7511(a)(1)(A), (C). Probationary employees thus have no statutory right of appeal to the Merit Systems Protection Board.

103. Given their exclusion from the right to appeal to the Board, the sole administrative recourse that was even potentially available to Plaintiffs was to file a complaint requesting that the Office of Special Counsel investigate a prohibited personnel practice. Prohibited personnel practices are listed in 5 U.S.C. § 2302(b). Protection against prohibited personnel practices encompasses probationary employees in the competitive or excepted service. *See* 5 U.S.C. § 2302(a)(2)(B).

104. Federal employees (including those in probationary status) who believe they have been subject to a prohibited personnel practice may submit a complaint to the Office of Special Counsel. 5 U.S.C. § 1214(a)(1)(A). But filing a complaint with the OSC does not guarantee a

path to judicial review, even for constitutional claims. Even if the OSC determines that an employee was subject to a prohibited personnel practice, there is no guarantee of a remedy and no guarantee of judicial review if no corrective action is taken.

105. When the OSC receives any allegation of a prohibited personnel practice, it is required to investigate. *Id.* If the Office finds reasonable grounds to believe that a prohibited personnel practice has occurred, it must report the determination to the Merit Systems Protection Board, the agency involved, and the Office of Personnel Management. *Id.* § 1214(b)(2)(B). The Special Counsel's report may include recommendations for corrective action. *Id.* But there is no requirement that the employing agency accept the recommendation for corrective action. *See id.* § 1214.

106. The OSC "may," but is not required to, petition the Merit Systems Protection Board for corrective action. *Id.* § 1214(b)(2)(B)–(C). If the employing agency does not choose to take corrective action and the OSC does not choose to seek relief from the Merit Systems Protection Board, the employee does not have their own right to seek relief from the Board.

107. Plaintiffs' lack of administrative recourse is compounded by the Trump-Vance administration's systematic undermining of the limited protections available to them. In February 2025, President Trump fired the head of the Office of Special Counsel without cause, in disregard of the statutory for-cause removal protections provided by Congress, and installed a series of political loyalists as Acting Special Counsels. The OSC was intended to protect the rights of federal workers like Plaintiffs, but the firing of the Special Counsel has prevented it from functioning independently, as intended by Congress.

108. For example, after President Trump fired the Special Counsel without cause, the OSC abruptly reversed its earlier determination in February 2025 that the Trump-Vance

administration's mass probationary terminations likely violated numerous statutes and regulations. This reversal sent a chilling message to federal workers that the OSC was now directly controlled by the White House and would favor political expediency over the express protections granted to probationary employees by Congress.

109.    Plaintiffs nonetheless each filed complaints with the Office of Special Counsel on December 4 or 5, 2025. A complaint with the Office generally must allege a violation of 5 U.S.C. § 2302. Accordingly, Plaintiffs could not directly assert a First Amendment claim. Instead, their complaints attempted to raise a claim that they were discriminated against "on the basis of conduct which does not adversely affect the performance of the employee or applicant or the performance of others," 5 U.S.C. § 2302(b)(10), and that they were subject to a personnel action that "violates any law, rule, or regulation implementing, or directly concerning, the merit system principles," 5 U.S.C. § 2302(b)(12). They each sought "corrective action to make [them] whole for the agency's unlawful conduct, including backpay, reinstatement, consequential and compensatory damages, attorneys fees and costs, and all other remedies available by law."

110.    On December 19, 2025, an OSC investigator contacted Plaintiffs' counsel regarding the complaints.

111.    Plaintiffs' counsel discussed the complaint with the OSC investigator via email and phone on numerous occasions, including phone calls on December 19, 2025; January 28, 2026; February 23, 2026; April 24, 2026; and May 18, 2026. With the exception of the initial call in December 2025, each of these calls was requested by Plaintiffs' counsel.

112.    During the calls, the investigator indicated that OSC was investigating Plaintiffs' complaints but that he could not provide details regarding the steps taken in the investigation or a

21

timeline for its completion. He also stated that he asked EPA to reinstate Plaintiffs while his investigation was ongoing, but the Agency refused.

113. During the call on May 18, 2026, Plaintiffs' counsel informed the OSC investigator that Plaintiffs were considering filing a lawsuit in court given the apparent lack of progress in the OSC investigation. Plaintiffs' counsel requested that OSC bring its investigation to a conclusion expeditiously.

114. As of the filing of this lawsuit, it has been nearly seven months since Plaintiffs filed their OSC complaints. Plaintiffs have received no indication from OSC of whether it intends to seek corrective action on their behalf.

## CAUSE OF ACTION

### Count I: First Amendment

115. Plaintiffs restate and reallege all paragraphs above as if fully set forth here.

116. Plaintiffs have a non-statutory right of action to seek, and federal courts have the equitable power to grant, injunctive relief for violations of federal law by federal officials.

117. The First Amendment to the U.S. Constitution protects the freedom of speech and the right to petition the government. Government employees do not give up their First Amendment rights when they take public employment.

118. EPA terminated Plaintiffs because they signed the Declaration of Dissent.

119. Plaintiffs' signing of the Declaration of Dissent was private citizen speech addressing matters of public concern. They spoke as private citizens because they were off-duty at the time of their speech, did not use any EPA resources in making the speech, did not speak pursuant to their official duties, and expressly stated in the Declaration that the statements were being made in their personal capacities.

120. The matters addressed in the Declaration of Dissent, which included politicization of the agency, science policy, and policies affecting various categories of federal employees, were of significant public concern.

121. Plaintiffs' interests in speaking about matters of public concern were not outweighed by the interests of EPA as an employer in promoting the efficiency of the public services it performs through its employees.

122. The speech at issue did not disrupt the workplace, impede Plaintiffs' ability to do their work, or harm the mission of the Agency. The Agency had no evidence of any such disruption or harm when it decided to terminate Plaintiffs. Instead, the Agency's own investigation concluded that there was no interference with Plaintiffs' work. Nevertheless, the Agency selected Plaintiffs for termination—not based on any assessment of the impact of their conduct on the Agency, but rather because they lacked the right to appeal their terminations to the Merit Systems Protection Board.

## PRAYER FOR RELIEF

Plaintiffs respectfully request that the Court enter the following relief:

A. Declare that EPA's terminations of Plaintiffs' employment violated the First Amendment.

B. Grant injunctive relief barring Defendants, their officers, employees, and agents from enforcing or otherwise giving effect to the unlawful terminations and requiring the reinstatement of Plaintiffs to their positions with back pay.

C. Award Plaintiffs their costs, reasonable attorney fees, and other disbursements as appropriate.

D.      Grant such other relief as the Court deems necessary, just, and proper.

Respectfully submitted,

*/s/ Shiva Kooragayala*
Jyoti Jasrasaria*
Shiva Kooragayala (IL Bar No. 6336195)
Tsuki Hoshijima*
Elena Goldstein*
Democracy Forward Foundation
P.O. Box 34553
Washington, D.C. 20043
Phone: (202) 448-9090
Fax: (202) 796-4426
jjasrasaria@democracyforward.org
skooragayala@democracyforward.org
thoshijima@democracyforward.org
egoldstein@democracyforward.org

Daniel M. Rosenthal*
Charlotte H. Schwartz*
Eric M. Essagof*
James & Hoffman, P.C.
1629 K Street NW, Suite 1050
Washington, DC 20006
Phone: (202) 496-0500
Fax: (202) 496-0555
dmrosenthal@jamhoff.com
chschwartz@jamhoff.com
emessagof@jamhoff.com

*Pro hac vice applications forthcoming*

*Counsel for Plaintiffs*